**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

National Fair Housing Alliance, Inc., *et al.*,

Plaintiffs,

v.

S.C. Bodner Company, Inc., *et al.*,

Defendants.

Case No. 1:10-CV-0993-RLY-DML

**APPENDIX OF CASES NOT GENERALLY REPORTED SUBMITTED IN SUPPORT OF PLAINTIFFS' OPPOSITION TO THE MOTIONS TO DISMISS FILED BY MORGAN DEFENDANTS (DOC. NOS. 110-111); BPTIC DEFENDANTS (DOC. NOS. 103-104); AND DEFENDANT CROSS LAKE (DOC. NOS. 107-108)**

| **Case** | **Page** |
|---|---|
| *HUD v. George*, Fair Housing —Fair Lending Reptr. ¶ 25,010 (HUD ALJ 1991) | App-1 |
| *Neiderhauser v. Independence Square Housing*, Fair Housing Fair Lending Reptr. ¶ 16,305 (N.D. Cal. 1998) | App-16 |

that it has or will become unable to carry out any or all of these agreements, in whole or in part, it shall so inform this tribunal, stating the reasons for its inability to so perform, and the Order may be modified as appropriate.

10. Within ninety (90) days of the date of this Order, Properties Unlimited staff shall attend a four-hour training by HOME on the Act. Within sixty (60) days of the first and second anniversary of this Order, Properties Unlimited staff shall again receive fair housing training from HOME.

11. Within ten (10) days of the date on which this Order becomes final, Respondents shall pay actual damages to Complainant Tamberelli as follows: $712.40 for lost wages; $30.00 for phone calls; $150.00 in moving expenses; $40.00 for gasoline; $100.00 rent for her Argonne Drive room; $678.75 for traveling to the hearing; and $2,500.00 for inconvenience and emotional distress.

12. Within ten (10) days of the date on which this Order becomes final, Respondents shall pay actual damages to HOME of $1,488.75 for out-of-pocket expenses and $3,592.00 to compensate HOME for future monitoring, testing, and training of the rental housing business owned by Respondent Eugene Jason.

13. Within ten (10) days of the date on which this Order becomes final, Respondent Eugene Jason shall pay a civil penalty of $2,000.00, Respondent Marian Buckley shall pay a civil penalty of $2,000.00, and Respondent Lisa Jason shall pay a civil penalty of $25.00 to the Secretary of HUD.

14. Within ten (10) days of the date this Order becomes final, Respondent Eugene Jason shall inform all Properties Unlimited agents and employees of the terms of this Order and educate them as to such terms and as to the requirements of the Fair Housing Act. All new employees shall be informed of such no later than the evening of their first day of employment.

15. Respondent Eugene Jason shall submit a report to this tribunal within fifteen (15) days of the date this Order becomes final detailing the steps taken to comply with this Order.

This Order is entered pursuant to 42 U.S.C. Sec. 3612(g)(3) of the Fair Housing Act and the regulations codified at 24 C.F.R. Sec. 104.910, and will become final upon the expiration of thirty (30) days or the affirmance, in whole or in part, by the Secretary within that time.

[¶25,010] HUD v. George, No. HUDALJ No. 01-89-0383-1 (HUD Office of Admin. Law Judges 8-16-91)

**(1) Vacant land was "dwelling" covered by Fair Housing Act because respondents intended to market it as a homesite.**

**(2) Although respondents had not advertised or listed vacant lot for sale on the open market, it was "offered for sale" within the meaning of the Fair Housing Act because they clearly attempted to sell it to complainant.**

**(3) Respondents violated Fair Housing Act by stating a discriminatory preference against handicapped persons—four mentally retarded persons, one with ambulation problems—and by breaking off negotiations for sale of house.**

Before: THOMAS C. HEINZ
Administrative Law Judge

## INITIAL DECISION

### *Statement of the Case*

This proceeding arises out of a complaint filed by Ann Faust, an agent of Independent Living Corporation d/b/a Corporation for Independent Living-CIL ("CIL"), the Complainant herein. The complaint alleged that Respondents Duane George ("George") and Northwest Realty Group, Inc. ("NWR") unlawfully discriminated against CIL by refusing to sell real estate to CIL because CIL intended to use the property to house mentally retarded people. The Department of Housing and Urban Development ("HUD" or "the Government") investigated the complaint, and after deciding that there was reasonable cause to believe that discriminatory acts had taken place, issued a Charge of Discrimination against the Respondents on January 25, 1991. The Charge alleged violations of sections 804(c), (d), and (f)(1) of the Fair Housing Act (sometimes "the Act").[1] (42 U.S.C. Sec. 3604(c), (d), and (f)(1)). On March 22, 1991, CIL was permitted to intervene as a separate party. Thereafter, an oral hearing was held in Hartford, Connecticut, from April 30, 1991, through May 2, 1991, at the close of which the parties were ordered to file proposed findings of fact, conclusions of law, and briefs in support thereof. The last brief was filed June 17, 1991.

### *Findings of Fact*

1. CIL is a nonprofit, 501(c)(3) corporation established in 1979 exclusively for the purpose of fostering the development of small, noninstitutional, community-based residences for people with disabilities or

[1] On brief the Government abandoned its claim that Respondents violated section 804(d) of the Act.

△ © 1991 PH, Inc. Fair Housing—Fair Lending

other structured residential needs. Ninety-five percent of the individuals for whom CIL provides housing are mentally retarded. In 1985, CIL became a holding company with several subsidiary corporations, which were organized by functional area of responsibility to assist CIL in carrying out its mission. The subsidiaries are also nonprofit, and operate under the control of CIL, whose primary function is to coordinate their activities and to engage in public education and awareness activities. Tr.I 7-8, 140; Sx. 1.[2]

2. CIL Realty, Inc. ("CIL Realty") is a subsidiary of CIL and acts as a real estate ownership entity for specialized housing projects. All of the properties owned by CIL Realty are leased to CIL member agencies, which are also nonprofit and which operate residential programs for handicapped people learning to live more independently. CIL Realty finances its construction or renovation on residences with construction lines of credit from local banks. Tr.I 10-11. After development has been completed, the residences are permanently financed with funds raised from tax-exempt bonds, thereby producing significant cost savings to the lessee agencies and state funding agencies. At the end of the lease term, the properties are donated to the lessees without cost. Tr.I 23; Sx. 1.

3. CIL Development, Inc. ("CIL Development") is another subsidiary of CIL. It provides a full range of real estate development services for member agencies of CIL, including site selection, construction and renovation of residences, as well as resident coordination and placement. This subsidiary also helps lessee agencies satisfy their various funding, licensing, and regulatory requirements. Tr.I 54; Sx. 1.

4. Ann Faust ("Faust") is a CIL housing developer. Tr.II 37. Although she is technically an employee of CIL Development, she works for CIL and all of its subsidiaries. Tr. 55-56. In 1989 and 1990 she was paid an annual salary of $39,000 to $41,000 based on a thirty-five hour work week. Tr.II 37-38.

5. NWR is a Connecticut corporation formed in 1985 for the purpose of developing properties and building houses. Tr.II 230-31. In 1989, George, Robert Paradis, and George Lasky each owned one-third of NWR. Tr.III 5. At the time of the hearing, the corporation was nearly dormant; it was doing only a few remodeling and renovation jobs from time to time. Tr.II 231.

6. George currently is the manager, half-owner, and Secretary of NWR. He has been responsible for developing land, building houses, and marketing properties. Tr.III 11.

7. Robert Paradis is the president and half-owner of NWR, but he has been only minimally involved in the operation of the company since its inception. Tr.II 231-32.

8. George Lasky performed site work and excavating for NWR in 1989. Tr.I 145, 151.

9. Residential Management Services ("RMS") is a nonprofit member agency of CIL that operates group homes and residential facilities for mentally retarded or developmentally disabled adults. Tr.I 20-21, 189-90.

10. On March 29, 1989, RMS and CIL Realty entered into a development contract wherein CIL Realty agreed to provide a full range of development services to find and acquire a property licensable as a group home. Tr.I 9-10; Sx.2. The contract required RMS to pay CIL Realty a fee "equal to six percent (6%) of the total cost of developing the residential setting, including, but not limited to, purchase price of the property, cost of renovations, and all related professional fees, to compensate the Corporation [CIL Realty] for its services in developing the residential setting." Sx.2, p.3. RMS further agreed to lease the developed property from CIL Realty. Sx.2. The lease was for a term of 25 years, with monthly rental payments based on property development costs at a rate sufficient to allow CIL to meet its bond financing debt service requirements. The monthly rental payments were not to exceed the fair rental value allowed by the Connecticut Department of Income Maintenance. Sx.2. The lease also included a five-year option to purchase and provided that CIL donate the house to RMS upon expiration of the lease, at no cost to RMS.

11. While CIL Realty routinely enters into this kind of contract with member agencies, development services are actually provided by CIL Development. Tr.I 56. Pursuant to this contract, Faust provided development services to RMS. Tr.I 192-93; Tr.II 41-42.

12. Faust typically needs a few months to find a suitable house, after which another six to eight weeks usually pass before CIL is ready to go to closing. More time is required if architectural plans are needed. Tr.II 40.

13. RMS wanted CIL to find and acquire a home for four mentally retarded individuals, one with ambulation problems. Tr.II

[2] The following reference abbreviations are used in this decision: "Tr.I" for "Transcript, volume I"; "Tr.II" for "Transcript, volume II"; "Tr.III" for "Transcript, volume III"; "Sx." for "Secretary's exhibit"; and "Rx." for "Respondents' exhibit."

43. RMS sought a four-bedroom house with city water and sewer located on a quiet, fairly level lot close to shopping and public transportation. Tr.I 193; Tr.II 44. RMS wanted the home to be ready for occupancy before the end of 1989. Tr.I 193.

14. After consulting with RMS to determine the needs of the prospective occupants of the group home, Faust contacted real estate agent Lorraine Joseph, and together they began looking at houses. Tr.I 65-68; Tr.II 44-45.

15. During their search for a house, Faust and Ms. Joseph visited the Cedar Ridge subdivision under development by NWR, where they looked at two models that on first inspection appeared to satisfy RMS's needs. Tr.I 70; Tr.II 46.

16. When Faust and Ms. Joseph later returned to Cedar Ridge with RMS representatives, including Paul Ford, Area Director of RMS, they determined on closer inspection that neither of the two models was satisfactory. However, they saw a third model, a split-level design, that was attractive, but none of the lots in the Cedar Ridge subdivision was level enough to meet the needs of the prospective occupant with ambulation problems. Tr.I 93; Tr.II 49-50, 51-52.

17. During this visit, George told Faust, Ms. Joseph, and the RMS representatives that he was working on another subdivision on Elm Street in nearby Oakville, Connecticut, where NWR could possibly build the split level on more level ground.[3] Tr.I 68, 198; Tr.II 52. George stated that the base price of the split level would be the same in the Elm Street project as in Cedar Ridge, $159,500. Tr.II 52, 89. George and Faust also discussed in general terms the modifications to the house that CIL would want made if CIL decided to buy the split-level design. Tr.II 64.

18. After George described the Elm Street subdivision, he, Faust, Ms. Joseph, Ms. Barbara Westberry (the listing real estate agent for the Cedar Ridge houses), and Mr. Ford went there, walked the land, and with the aid of a subdivision map provided by George, determined the location of the various lots. At this point, very little work had been done on the land beyond clearing it; no street had been constructed. Tr.II 53-56.

19. After George showed Faust the Elm Street land, Ms. Westberry gave Faust copies of the Elm Street subdivision map and the floor plan for the split-level design. Tr.II 58; Sx. 6, 7A.

20. RMS and Faust decided that they wanted to purchase the split level on a lot in the Elm Street subdivision, and then sought approval of the house and site from the Connecticut Department of Mental Retardation ("DMR"). Tr.II 57, 60-65.

21. Faust and RMS representatives showed an existing split-level house in the Cedar Ridge subdivision and lots 3 and 4 in the Elm Street subdivision to Sandy Petkus, Assistant Regional Director for DMR. Tr.I 203; Tr.II 62, 66. Ms. Petkus, on behalf of DMR, approved both lots and the split-level design. Tr.II 62, 66.

22. After receiving DMR approval, Faust and the RMS representatives returned to Elm Street and decided that Lot 4 was their first choice. Tr.II 69.

23. After CIL and RMS determined that Lot 4 was their first choice in the Elm Street subdivision, in order to preclude the sale of Lot 4 to another party, CIL's realtor, at Faust's request, drafted an "Offer to Purchase," using a pre-printed form. That document states, *inter alia*:

> This is to be considered a reservation subject to buyers & sellers agreeing on plans, specifications & price. There shall be no formal contract or transfer of deposits until seller has received final subdivision approvals.

Sx.3; Tr.II 72-77. The terms of the Offer to Purchase provided that closing and transfer of title were to occur on or before October 31, 1989, a date chosen on the basis of George's representation that it would take about 90 days to build the house and the expectation that all the details of the transaction could be completed by June 30, 1989. Tr.II 70, 73-74; Tr.III 73.

24. CIL Realty executed the Offer to Purchase on May 30, 1989, and George signed it on behalf of NWR on June 1, 1989. Sx.3.

25. On May 30, 1989, Faust was fully aware that NWR and CIL Realty could not enter into a final purchase agreement for Lot 4 until the Elm Street subdivision had received final approvals from local officials. Tr.II 72. (NWR received final approvals on August 5, 1989.) Faust also knew that before the parties could enter into a final agreement, CIL would have to prepare the specifications for a revised floor plan, and CIL and NWR would have to agree on the price of modifying the split level to meet the needs of RMS. Tr.II 72.

26. Using a floor plan and a list of standard features in NWR homes provided by Ms. Westberry, Faust prepared a revised

[3] At some places in this record, this property is referred to as the "Hazelwood" subdivision.

floor plan and a detailed specifications list for proposed additions to the standard features of the split-level house. Tr.II 58, 78-9, 82-84; Sx. 9A.

27. On Friday, June 16, 1989, after receiving approval from RMS of the specifications list and revised floor plan, Faust met with RMS representatives, Ms. Joseph, George, and Ms. Westberry in Ms. Joseph's business office to start negotiating a purchase contract and to discuss features that CIL and RMS wanted in the split level. Tr.II 89, 96-97, 102; Tr.III 68, 153.

28. The modifications that CIL and RMS wanted made to the basic split level design for the Elm Street property were estimated to cost $15,684. Tr.II 28; Sx. 27.

29. During the June 16th meeting, George said that his partners had expressed concern that having a group home as the first home in the Elm Street subdivision would make it harder to market and sell the remaining houses. Tr.II 91; Sx. 10. According to George, his partners feared that negative perceptions of a group home in the minds of prospective buyers would adversely affect the value of the remaining Elm Street lots. Tr.I 232-33; Tr.II 92; Sx. 10.

30. In response to the concerns George raised at the June 16th meeting, Faust immediately gave him written information regarding state zoning law and studies demonstrating that a group home has no effect on nearby property values or the amount of time it takes to sell neighboring property. Tr.II 93; Sx. 4, 5, 11, 12.

31. Having frequently encountered the attitude voiced by George about group homes, Faust came to the meeting prepared to hand out information meant to allay such fears. Tr.II 93-95. During the meeting, she and representatives from RMS attempted to persuade George that his partners' concerns about the potential negative effects of a group home in the Elm Street subdivision were unfounded. Tr.I 211; Tr.II 95-96.

32. Immediately after the June 16th meeting, Faust and Mr. Ford drove George by several group homes developed by CIL to show him how well they fit into their neighborhoods. Tr.I 212-13; Tr.II 97-99; Sx. 13A, 13B. George said he would describe what he had seen to his partners and then get back to Faust. Tr.II 99; Tr.III 71.

33. In a telephone conversation on Monday, June 19, 1989, George told Faust that he had talked to his partners and they had decided not to sell a house in the Elm Street subdivision to CIL. He said that they had decided they did not want a group home located in the new subdivision. Tr.II 104.

34. During the June 19th telephone conversation between Faust and George, Faust told George that she was considering filing a discrimination complaint against him. He responded in words to the effect that, if she did so, she would be sorry: he would take the lot off the market and construct a "spec house" on it that would not meet CIL's needs.[4] Tr.II 104-06.

35. On June 21, 1989, Faust signed a HUD housing discrimination complaint stating that George and NWR had refused to sell Lot 4 in the Elm Street subdivision to CIL because CIL was going to have a group home for mentally retarded individuals built on it. Sx. 14.

36. During the period beginning with Faust's first visit to the Elm Street property and ending with the breakoff of negotiations on June 19, 1989, all parties were under the impression that the proposed split-level house would fit on either Lot 3 or Lot 4. Tr.II 67. However, zoning "setback" requirements would have precluded building the split-level house on Lot 4. Tr.I 184-86; Sx. 6, 7A, 7C, 31A, 31B, 32, 33.

37. From April 5, 1989 (the day Faust began work on this RMS project), through June 19, 1989, Faust devoted 35.5 hours to finding a house for RMS. Sx. 25A. Faust also traveled 105 miles on June 16, 1989, to attend the meeting with George regarding the Elm Street property. Sx. 26.

38. After Respondents refused to sell Lot 4 to CIL, Faust continued to look for a suitable property. Tr.I 82; Tr.II 110, 116, 127. By January 1, 1990, Faust had found a property on Buckingham Street that also met RMS's needs. Tr.II 125. CIL Realty purchased the Buckingham Street property for $180,000. Tr.II 128; Sx. 23B. CIL Realty closed on the Buckingham Street house on March 22, 1990. Sx. 23B.

39. CIL spent an additional $56,284.33 to modify the Buckingham Street property and $13,141.45 for carrying charges.[5] Tr.II 128, 133, 136, 140-42; Sx. 24, 34.

40. During the nine month period beginning June 22, 1989, and ending March 22, 1990, Faust devoted 51 hours to developing the Buckingham Street property. Sx. 23A, 23B. She was not actively looking for a house for RMS during the entire nine

[4] A "spec house" is a house built without a specific buyer in mind and then put on the market. Tr.III 38.

[5] Carrying charges are the costs of holding a property until it is licensed and therefore rentable. Tr.II 40. In this instance, the carrying charges consisted of utilities, loan interest, insurance, and taxes. Tr.II 140-42. Faust testified that CIL had additional carrying charges for the Buckingham Street property that would not have been incurred on the Elm Street property. Tr.II 133. She did not say the split level could have been purchased without incurring any carrying charges.

months because Connecticut stopped approving any group homes for several months while the state revised the approval process. Tr.II 117. After June 22, 1989, Faust traveled 303 miles looking for another house for RMS. Tr.II 117, 144-45; Sx. 26.

41. CIL recovers the cost of delivering development services by charging member agencies a flat 6 percent development fee for completed projects. Tr.I 120-23. Time and travel expenses spent pursuing any property that CIL ultimately is unable to purchase is a loss for CIL. Tr.I 120-23.

42. Faust spent a total of 52.5 hours pursuing CIL's fair housing complaint. Tr.II 107-08, 150; Sx. 25A, C, D.

43. CIL bills Faust's time when she works on a consulting basis at $50 per hour. Tr.II 150. CIL reimburses Faust 22.5 cents per mile for the use of her personal automobile on official business. Tr.II 145.

*Subsidiary Findings and Discussion*

The Congress passed the Fair Housing Act to "[e]nsure the removal of artificial, arbitrary, and unnecessary barriers [that] operate invidiously to discriminate on the basis of impermissible characteristics." *United States v. City of Black Jack*, 508 F.2d 1179 (8th Cir.), *cert. denied*, 422 U.S. 1042 (1974), *reh. denied*, 434 U.S. 884 (1975). The Act was designed to prohibit "all forms of discrimination [even the] simple-minded." *United States v. Parma*, 494 F. Supp. 1049, 1053 (N.D. Ohio 1980), *rev'd on other grounds*, 661 F.2d 562 (6th Cir.), *cert. denied*, 465 U.S. 926 (1982). Under the Act, any "aggrieved person" has standing to file a complaint. An aggrieved person is "any person who claims to have been injured by a discriminatory housing practice; or [who] believes that such person will be injured by a discriminatory housing practice that is about to occur." 42 U.S.C. Sec. 3601(i); 24 C.F.R. Sec. 100.20. The sole requirement for standing under the Act is that a complainant allege "a distinct and palpable injury" caused by a respondent. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982), *quoting Warth v. Seldin*, 422 U.S. 490, 501 (1975). This requirement applies to individuals and organizations alike. *Spann v. Colonial Village, Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990), *cert. denied*, ___ U.S. ___, 111 S. Ct. 508 (1990).[6] In the Charge of Discrimination, the Government alleged the requisite injury by asserting that the Complainant CIL "has suffered damages in the form of economic loss, frustration of its corporate purposes, and the loss of its civil rights as a result of the respondents' conduct."[7]

The Act applies to any transaction involving a "dwelling," defined as:

> Any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale. . .for the construction or location thereon of any such building, structure, or portion thereof. [emphasis added]

42 U.S.C. Sec. 3602(b). The Act does not define the phrase "offered for sale." In the face of this silence, the Government argues the phrase should be given the same broad construction that the courts have repeatedly given to other terms of the Act in order to further the Act's explicit goal "to provide, within constitutional limits, for fair housing throughout the United States." 42 U.S.C. Sec. 3601.[8] For example, in interpreting the requirement for a "bona fide offer" in section 804(a), courts have not required strict compliance with the technicalities of contract law. *E.g., Wang v. Lake Maxinhall Estates, Inc.*, 531 F.2d 832 (1976); *Davis v. Mansards*, 597 F. Supp. 334, 343 (N.D. Ind. 1984). *See* Schwemm, *Housing Discrimination Law and Litigation* Sec. 13.3 at 13-7-8 (1990) (protected homeseeker's offer in refusal to sell or rent cases has always been deemed bona fide). Similarly, the definition of "dwelling" in section 802(b) of the Act has received a broad interpretation. *Gilbert*, 813 F.2d at 1527 (describing a variety of housing covered as 802(b) "dwellings"). One state court has ruled that a tract of vacant land advertised for sale was not a dwelling under 802(b) in the absence of evidence of the seller's intent "to market the land as homesites." *Ryan v. Brown*, 326

[6]Respondents contend for the first time on brief that the case should be dismissed because Complainant has failed to satisfy standing requirements. Respondents mistakenly argue that Complainant has suffered no economic injury at the hands of the Respondents. *See* discussion *infra*, pages 15-19. Respondents' argument regarding standing is therefore without merit.

[7]On brief, the Government has abandoned its claim regarding loss of civil rights.

[8]*See, e.g., Trafficante v. Metropolitan Life Insurance Co.*, 409 U.S. 205, 209 (1972) ("The language of the Act is broad and inclusive."); *Huntington Branch, NAACP v. Huntington*, 844 F.2d 926, 936, 937 (2d Cir.) ("[T]he Supreme Court has held that [the Act] must be construed expansively to implement [the goal of ending discrimination in housing]"; "Congress intended that broad application of [the Act's] antidiscrimination provisions would ultimately result in residential integration."), *aff'd per curiam*, 488 U.S. 15 (1988), *reh. denied*, 488 U.S. 1023 (1988); *United States v. Gilbert*, 813 F.2d 1523, 1526-27 (9th Cir. 1987), *cert. denied*, 484 U.S. 860 (1987) ("The Supreme Court has observed that [the] expansive approach [to construing the Act] is carried *throughout the Act*.") (emphasis added).

So. 2d 70, 72-73 (Fla. Dist. Ct. App. 1976). The corollary of this holding is that vacant land will be considered a "dwelling" under section 802(b) if the evidence shows an intent to market the land as homesites.

Other federal law also supports the Government's argument that "offered for sale" must be broadly construed. The term "offered for sale" or "offer to sell" appears in several federal statutes. *See, e.g.*, 12 U.S.C. Sec. 1715y; 15 U.S.C. Sec. 77b; 15 U.S.C. Sec. 1701; 15 U.S.C. Secs. 3603-04; 38 U.S.C. Sec. 1812; 43 U.S.C. Secs. 562, 571. Of these, the Interstate Land Sales Disclosure Act ("ILSDA"), 15 U.S.C. Secs. 1701-20, which regulates developers' sales of certain types of land, is the most helpful as it provides useful statutory definitions. ILSDA defines developers as persons who "offer to sell" lots in a subdivision. 15 U.S.C. Sec. 1705(5). ILSDA also provides that "offer" includes any inducement, solicitation or attempt to encourage a person to acquire a lot in a subdivision." 15 U.S.C. Sec. 1701(11). Therefore, developers or brokers "offer" a property for sale once they have commenced to market a particular parcel of land to a potential buyer through *any* inducement or attempt to encourage the purchase of that parcel. That means "offers" include a wide variety of acts ranging from a mere exhortation to a prospective buyer to view a piece of land, to negotiations and attempts to persuade a buyer to execute a purchase agreement. ILSDA does not narrowly define "offer for sale" to encompass only those promises to sell land which, if accepted, would create an enforceable contract. Respondents' conduct in the instant case clearly falls within the definition of "offer for sale" in ILSDA.

Respondents' conduct likewise falls within the meaning of the term "offered for sale" in the Fair Housing Act. Faust and George first met at the Cedar Ridge subdivision. From the moment George first learned of CIL's interest in the split-level design provided it could be built on more level ground, he began actively to market a lot in the Elm Street subdivision. He marketed Lot 4 to CIL by telling Faust of his development plans for the property, showing her the cleared subdivision land, discussing planned levelling of the ground, and showing her a site plan that delineated the physical boundaries of the subdivision lots. Further, he told her that he could build the split level CIL and RMS desired at Elm Street and sell it for the same base price as the split level at Cedar Ridge. These activities led to the parties' executing an offer that reserved Lot 4 for CIL.[9] Thereafter, George attended the June 16th meeting for the express purpose of negotiating new specifications for the house CIL wanted built on Lot 4. Despite the fact that NWR had not advertised or listed the Elm Street property for sale, George clearly was attempting to sell land in the Elm Street subdivision to CIL for the purpose of building a house. Faust's conduct during the same period manifests a complementary attempt by CIL to buy land on Elm Street with an NWR-built house on it. The intent of the parties could not have been plainer: they intended to enter into a contract for the sale of a dwelling.

Respondents argue that Lot 4 was not "offered for sale" within the meaning of contract law, citing the definition of "offer" in the Second Restatement of Contracts, Section 24:

> a manifestation of a willingness to enter into a bargain so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.

This argument falls short of the mark, because if credited, Respondents' interpretation of the Act would permit housing providers to discriminate with impunity as long as no offer to sell is made that is so clear and complete that an enforceable contract will be created if the buyer gives his assent. Such a pinched and restrictive interpretation clearly runs contrary to the remedial purposes of the Act.[10]

Citing 42 U.S.C. Sec. 1982, the Civil Rights Act of 1866, Respondents urge us to read "offered for sale" in the Fair Housing Act to mean the same as the requirement in Section 1982 cases that a property must be placed "on the open market for sale" in order to come within the purview of the statute. This reading of the Act must be rejected for the same reason that contract law cannot be used to construe the Act: both interpretations would serve to narrow rather than broaden the reach of the Act to combat housing discrimination, contrary to the intent of the Congress.

Interpreting the phrase "offered for sale" broadly comports with other parts of the statute. For example, the Act prohibits discrimination during *negotiation* for sale or rental (42 U.S.C. Sec. 3604(a)) and prohibits a variety of activities that precede

[9]Even George admits that "showing the land" is "marketing," but he contends that is so only if the subdivision is approved. Tr.III 43-46, 51-52. He gave no basis for that distinction, and there is none.

[10]"Congress was aware that. . .[the Act[ would have a very broad reach, and indeed the legislation was seen as an attempt to alter the whole character of the housing market." *Mayers v. Ridley*, 465 F.2d 630, 652 (D.C. Cir. 1972) (*en banc*) (Wilkey, J., concurring).

actual sale or rental. *See* 42 U.S.C. Sec. 3604(c) (discriminatory statements); 42 U.S.C. Sec. 3604(d) (representations regarding availability).

Respondents also contend that Lot 4 was not offered for sale because it would have been unlawful to do so before receipt of all the required subdivision approvals under Connecticut General Statutes Section 8-25(a); and the approvals did not arrive until after August 5, 1989. It is inappropriate, however, to turn to state law for interpretation of the Act. *See* Kushner, *Fair Housing* 8 (1983) ("State and local laws which hamper the enforcement of Title VIII are preempted by federal law."). Section 8-25(a) provides no guidance on its face as to what conduct constitutes offering subdivision land for sale.[11] Furthermore, according to Connecticut courts, since Connecticut General Statute Section 8-25(a) is a criminal statute, "offered for sale" must be construed narrowly *in that context.*[12] Conversely, each provision of the Fair Housing Act is to be given the broadest possible interpretation to ensure equal housing opportunities for everyone within the protected class of people. While Lot 4 may or may not have been "offered for sale" under Connecticut law, the purpose of the Fair Housing Act and the evidence of record require the conclusion that the Respondents offered a "dwelling" for sale to CIL.

### *Respondents Violated Section 804(c) of the Act*

Section 804(c) of the Fair Housing Act makes it unlawful

> To make. . .any. . .statement. . .with respect to the sale. . .of a dwelling that indicates any preference, limitation, or discrimination based on. . .handicap. . .or an intention to make any such preference, limitation, or discrimination.

42 U.S.C. Sec. 3604(c). This provision applies to all written or oral statements made by a person engaged in the sale of a dwelling. 24 C.F.R. Sec. 100.75. Respondents violated Section 804(c) of the Act by making numerous statements regarding the sale of a dwelling that indicated a preference, limitation, or discrimination based on handicap or the intention to make such preference, limitation, or discrimination.

During a June 16, 1989, meeting with Faust and Mr. Ford of RMS, George made several statements indicating that NWR preferred not to sell to handicapped people. Faust and Mr. Ford testified that George stated that his partners at NWR were concerned about the adverse impact of selling the first lot in the Elm Street subdivision as the site of a group home. He said his partners feared that having a group home as the first house would lower the value of the surrounding lots and cause slower sales.

The testimony of Faust and Mr. Ford is corroborated by notes Faust made in a job report prepared shortly after the meeting. That report states in pertinent part:

> 11. Mr. George expressed concerns regarding property value and length of time on the market of properties surrounding community residences.[13]
>
> 12. Mr. George was not able to negotiate a contract at this time because of these concerns. Addresses of local community residences were given to him so he can drive by them,
>
> 13. Mr. George will notify the sellers [*sic*] by June 23, 1989, of his decision to sell Lot 4 to CIL Realty Incorporated or to take it off the market.

Sx. 10.

George denies making any discriminatory statements at the June 16th meeting. He claims that he merely voiced his partners' concerns regarding the appearance the house would have after being modified to meet CIL's needs, and that those concerns were "buyer neutral"; that is, the owners of NWR were no more concerned about the impact of the changes CIL wanted to make than they would have been about modifications any buyer might have wanted made. The evidence does not support this contention. Mr. Lasky was an owner during the time these events occurred, and he specifically mentioned wheelchair ramps as the subject of their concern. Tr.I 147. Further, the president of NWR, Mr. Paradis, testified regarding CIL's interest in buying a house to be used as a group home as follows:

> The only concern I had at the time was simply what do these homes look like? These people have special needs and just

[11] Conn. Gen. Stat. Sec. 8-25(a) provides in pertinent part:

Any person, firm or corporation who, prior to such final approval sells or offers for sale any lot subdivided pursuant to a conditional approval shall be fined not more than five hundred dollars for each lot sold or offered for sale.

[12] *State v. White*, 204 Conn. 410; 528 A.2d 811, 814 (1987); *State v. McGann*, 199 Conn. 163; 506 A.2d 109 (1986).

[13] Faust testified that in her report she did not distinguish George's personal concerns from those of his partners. However, she said that the concerns recounted in paragraphs 11 and 12 of her job report were attributed by George to his partners. Tr.II 103.

what does a home look like or what will it look like.

Tr.II 236. The testimony of two of NWR's owners shows their concern was not "buyer neutral." On the contrary, the owners of NWR clearly were worried about the superficial appearance of a house that would be occupied by handicapped people. This conclusion is confirmed by evidence that Faust gave George written information addressing common misconceptions about the economic impact of group homes and by evidence that Faust and Mr. Ford took George to see a few exemplary group homes so that he could see how well they fit into their neighborhoods. The statements made during the June 16th meeting manifest an unlawful discriminatory preference against handicapped people.

According to Faust, on June 19, 1989, in a telephone conversation with Faust, George said NWR would not sell a house in the Elm Street subdivision to a group home. Later in that conversation, after having been advised by Faust that she was considering filing a discrimination complaint, George said that she would be sorry and threatened to take Lot 4 "off the market," build a "spec" house on it that would not meet CIL's needs, and then put it back on the market.

George and Faust presented two markedly different versions of their telephone conversation of June 19th. Faust's version is more credible for several reasons. As a salaried employee of CIL, Faust had no economic motive to testify untruthfully, unlike George. Further, George's statements during the June 19th telephone conversation, as reported by Faust, are wholly consistent with the statements he made during the June 16th meeting. George's memory of the content of the June 19th conversation was implausibly better and more specific at hearing than his memory of the same conversation when he was deposed months earlier. Tr.III 80-81, 154-155. George acknowledged that Faust became upset and angry during the June 19th telephone conversation, but he proffered a very implausible explanation for that anger. According to George, Faust became angry when he informed her that NWR could not build on Lot 4 or enter into a contract for Lot 4 at that time because subdivision approvals had not been obtained, but that NWR would be happy to build a house for CIL someplace else. Tr.III 79-81. But Faust knew well before June 19th that NWR could not contract to build a house on Lot 4 until approvals of the subdivision had been secured from local officials. Tr.III 43, 64-65. It is highly unlikely that Faust would have become angry and upset upon being reminded of something she already knew. While it is true that the "Offer of Purchase" indicated on its face that CIL wanted to go to closing before November 1st, given George's representation that the house could be built in 90 days, the parties could have entered into a formal contract as late as some time in September and still have satisfied RMS's desire to occupy the house by the end of the year. Tr.I 193. Since Faust's job was to satisfy RMS, and RMS apparently had not imposed an October 31 deadline, I do not believe that after having invested a fair amount of time in the project Faust would have become so angry that she would break off negotiations for an attractive house at an attractive price and file a housing discrimination complaint simply because an inconsequential deadline could not be met. George's description of the June 19th telephone conversation cannot be credited.

### *Respondents Violated Section 804(f)(1) of the Act*

Section 804(f)(1) of the Act makes it unlawful

> To discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of. . .a person residing in or intending to reside in that dwelling after it is so sold, rented or made unavailable. . . .

42 U.S.C. Sec. 3604(f)(1). Respondents also violated Section 804(f)(1) on June 19, 1989, by refusing to continue negotiations for the sale of a dwelling in the Elm Street subdivision because the house was going to be occupied by people with handicaps. That violation was compounded by George's expression of a willingness to sell CIL a house in another location.[14] NWR, through its agent George, was "steering" CIL away from its new subdivision because of the perceived fears that a sale to CIL would depress sale prices on the remaining properties in the subdivision. "Steering" is not an outright refusal to sell to a person within a protected class; rather it consists of efforts to deprive a protected homeseeker of housing opportunities in certain locations. *See generally* Schwemm, *supra*, at 13-11. This type of violation falls within the "otherwise make unavailable" proscriptions of sections 804(a) and (f)(1).

[14] This was an empty gesture as to the Cedar Ridge subdivision; NWR knew that none of the lots in Cedar Ridge was level enough to meet CIL's needs.

### *Remedies*

Section 812(g)(3) of the Act provides that upon a finding that a respondent has violated the Act, an administrative law judge shall order "such relief as may be appropriate, which may include actual damages suffered by the aggrieved person." 42 U.S.C. Sec. 3612(g)(3). Respondents have violated the Act through conduct that has caused actual, compensable damages to CIL.[15]

### *CIL's Damages*

The Government seeks on behalf of CIL $87,935.14 in damages in three separate categories of alleged losses: $79,435.14 for out-of-pocket expenses[16]; $3,000.00 for lost housing opportunity; and $5,500.00 for frustration of corporate purpose.

### *Out-of-pocket Losses*

Not counting closing costs and CIL's development fee, the project development cost of the Buckingham Street property totalled $249,425.33, consisting of an $180,000.00 purchase price, $3,306.33 architect's fees, $13,141.00 carrying charges, and $52,978.00 in modification expenses.[17] The Government contends that the Elm Street property would have cost only $175,184.00, consisting of $159,500.00 base price, plus $15,684.00 for modifications. The difference in price between the two houses comes to $74,241.33, to which the Government adds $2,618.81 for Faust's expenses generated in connection with the Buckingham Street property, and $2,575.00 for the cost of Faust's time devoted to this case. These three figures add to $79,435.14, the amount claimed for out-of-pocket economic losses.

The Government contends that CIL is entitled to a damage award equal to the difference in the total development costs of the two properties because Respondents' refusal to sell Lot 4 in the Elm Street subdivision "forced" CIL to look for another property, ultimately buy the more expensive property on Buckingham Street, and incur architectural and carrying charges that it would not have incurred in the development of the proposed split level at Elm Street.[18] The Government cites two cases in support of its argument that the cost of more expensive alternate housing is recoverable from persons guilty of housing discrimination: *Moore v. Townsend*, 421 F. Supp. 378 (N.D. Ill. 1976), *aff'd as modified*, 577 F.2d 424 (7th Cir. 1978); and *Hughes v. Dyer*, 378 F. Supp. 1305, 1310 (W.D. Mo. 1974).

The *Moore* decision was issued in the aftermath of an earlier decision in a fair housing action brought under the Civil Rights Act of 1968, 42 U.S.C. Sec. 3601, *et seq.* and the Civil Rights Act of 1866, 42 U.S.C. Sec. 1982, in which the District Court ordered the defendant Townsend to convey residential real estate to the plaintiffs, Mr. and Mrs. Moore. The order was stayed while the defendant unsuccessfully appealed, after which the case came back to the District Court for determination of the damages that had accrued during the stay of the Court's order and the pendency of the appeal. The Court denied all of the Moores' damage claims except a claim for the damages occasioned by an increase in the rate of interest on the mortgage loan over the rate of interest that would have been obtained if the Court's order had not been stayed during the appeal. The Court did not honor the plaintiffs' claim for the gross amount of extra interest the Moores would have to pay over the 25-year life of the mortgage. Instead, the Court awarded an amount equal to the present value of the gross amount of potential interest liability. This award rested exclusively on consideration of damages attributable to the appeal; the Court did not say what damages might be awarded if plaintiffs had claimed under the Civil Rights Act of 1968. This case therefore does not stand for the proposition that a victim of discrimination under the Fair Housing

---

[15]Respondents argue to the effect that whatever damages were suffered were not suffered by Complainant CIL but rather by subsidiary corporations of CIL that are not parties in the case. This argument has no merit. The record shows the operations of the parent and its wholly owned subsidiaries are so closely intertwined that it would be a triumph of form over substance to say that the parent suffered no damage as a result of damage to the subsidiaries. Damage to CIL Realty and CIL Development necessarily caused damage to CIL. *See Universal Oil Products, Co. v. Rexall Drug & Chemical Co.*, 463 F.2d 1122, 1124 (C.C.P. A. 1972). Furthermore, that the subsidiaries were not named parties caused Respondents no undue prejudice. For example, Respondents were clearly on notice before the hearing as to the existence of CIL Realty and its relationship to CIL. *See* Sx.3; Intervenor's Responses to Respondents' Interrogatory #1(a)(i)-(iv).

[16]This figure is the sum of the differences in cost between the modified Elm Street house and the Buckingham Street residence, as reflected in the text of the Government's brief. However, the Government's proposed order asks for a total of $70,340.59 for out-of-pocket losses. I assume the Government is requesting an award of the larger amount.

[17]Sx. 34 shows immaterially different development costs for this property.

[18]CIL concedes that the proposed split level could not have been built on Lot 4 because of "setback" requirements. This fact was not known to the parties during their negotiations. However, the split level could have been built on either Lot 2 or Lot 3 in the subdivision, both of which were available at least until August 14, 1989.

Act may recover the difference in cost between the price of the dwelling made unavailable by unlawful discrimination and the cost of more expensive alternate housing.

In the *Hughes* case, after the defendant refused to sell a house to the plaintiffs because of their race, they bought a more expensive house and sought damages for the difference in price between the two houses. The Court denied the claim, stating:

> Plaintiffs claim they are entitled to the $5,500 difference in purchase prices on the theory that defendant's actions forced them to incur this additional expense in buying a house. At trial, however, it developed that plaintiffs' new home was larger and in certain respects more valuable than defendant's property. Thus, though plaintiffs may in fact have paid more in the second transaction, and, conceivably may have received less for their money, any actual damage is highly speculative and incapable of precise calculation.

378 F. Supp. at 1310. In short, neither of the cited cases supports the Government's argument.

Although the increased cost of alternate housing may be recovered under some circumstances, in the instant case the record will not support such an award.[19] To be sure, Respondents' refusal to sell forced CIL to look for another property; but that refusal did not per se "force" CIL to buy a more expensive property. CIL paid $180,000.00 for the house on Buckingham Street, but the record does not show that there were no other suitable properties on the market for less than $180,000.00 within a reasonable period after negotiations between CIL and NWR broke down. Further, Faust testified that the Buckingham property is inferior to the split level they wanted to have built on Elm Street in that it is on a smaller lot and closer to heavy street traffic. But that is not enough evidence to conclude that the Buckingham Street house is indeed an inferior house, and the fact that it cost approximately $20,000.00 more before modifications than the basic split level suggests that despite its smaller lot and closer proximity to heavy street traffic, the Buckingham Street house has other features that may make it a superior value.

In any event, whether or not the Buckingham house is inferior to the house CIL wanted to buy on Elm Street, the mere fact that CIL bought a more expensive house for RMS than the Elm Street house does not mean that CIL has been damaged in an amount equal to the difference in cost between the two houses. CIL rented the Buckingham Street property to RMS at a fair rental value. CIL therefore is receiving a fair return on its investment. In other words, CIL has suffered no damage as a result of buying a more expensive house than it had hoped to buy from NWR; CIL is passing all of its costs on to RMS. Because RMS is paying more rent for the Buckingham property than it would have paid for the Elm Street property, RMS is the party that is suffering the damage; but RMS is not a party to this case, and CIL cannot recover for losses incurred by RMS.

Respondents' conduct caused CIL to divert some of its resources from the development of group homes for the mentally handicapped to pursuing a legal remedy for Respondents' unlawful conduct. The 52.5 hours Faust devoted to pre-trial preparation and to the hearing cost CIL $2,575, and during that time she was precluded from working to foster housing opportunities for mentally retarded people. The time and money that an organization like CIL spends pursuing a legal remedy for housing discrimination diverts time and money away from the organization's other functions and goals.[20] In other words, discrimination costs the organization the opportunity to use its resources elsewhere. These "opportunity costs" for the diversion of resources should be recouped from the parties responsible for the discrimination. *See Village of Bellwood v. Dwivedi*, 895 F.2d 1521, 1526 (7th Cir. 1990) ("These are opportunity costs of discrimination, since although the counseling is not impaired directly, there would be more of it were it not for the. . .discrimination."); *Saunders v. General Servs. Corp.*, 659 F. Supp. 1042, 1060 (E.D. Va. 1987) ($2,300 for "diversion of resources"); *Davis v. Mansards*, 597 F. Supp. 334, 348 (N.D. Ind. 1984) ($4,280 for out-of-pocket expenses). CIL will be awarded $2,575.00 for the diversion of its resources to litigate this case.

Respondents also caused CIL to divert and waste its resources in pursuing the Elm Street house. Before negotiations with Respondents collapsed, Faust devoted 35.5 hours to developing a house for RMS. This is a clear loss to CIL for which it will be compensated in the amount of $1,775.00 ($50 per hour × 35.5 hours).

The Government requests an award of damages for the expenses CIL incurred to

[19] *See generally* Schwemm, *supra*, para. 25.3(2)(b) and cases cited in footnotes 73, 78, and 81.

[20] To the extent that this case deters Respondents and others from discriminating in future against group homes for the handicapped, the case will further the mission of CIL; that is, it will serve to foster the development of group homes for the disabled. However, pursuing litigation is not a stated purpose of CIL.

develop the Buckingham Street property rather than an award for the expenses incurred in connection with the Elm Street property. This request for damages cannot be honored. Faust performed 51 hours of development work after NWR refused to sell the Elm Street property. Since CIL bills Faust's time at $50 per hour, the Government claims $2,550.00 for the extra development work Faust did for RMS subsequent to Respondents' refusal to sell. In addition, Faust traveled 330 miles at a cost of $68.18 in connection with the Buckingham Street project. CIL earned a larger development fee on the Buckingham Street property than it would have earned if it had purchased the Elm Street property. Using the Government's figures, CIL earned $4,454.48 more, and that amount is $1,836.30 more than the cost of Faust's time and travel spent in connection with the Buckingham Street property.[21] The Government acknowledges the difference, but nevertheless asserts (without giving reasons) that it would be "unjust" not to reimburse CIL for Faust's time and travel expenses incurred after NWR refused to sell the Elm Street property. Inasmuch as CIL made more money than it paid Faust to pursue the Buckingham Street property, the incremental cost of her time and travel expenses incurred after collapse of the Elm Street project benefited rather than injured CIL. These costs therefore do not reflect compensable damage to CIL.

The Government also claims that CIL is entitled to damages of $3,000.00 for the housing opportunity it allegedly lost due to Respondents' unlawful discrimination. The Government argues that because Respondents refused to sell Lot 4 or negotiate with CIL for the sale of any other lot in the project, CIL was denied the opportunity to buy the house it wanted and instead had to buy a less favorable house on a smaller lot in an area with heavier traffic. However, CIL did not lose a housing opportunity; that is, CIL was not looking for housing for itself, or even for its client agency, RMS. Rather, CIL was developing property for four unnamed adults who, because of their handicaps, were members of the class of people protected by the Act. Although CIL falls within the Act's definition of an "aggrieved person" with standing to sue for damages, CIL is twice removed from the people who actually suffered a lost housing opportunity at the hands of the Respondents. In other words, CIL has suffered actual damages for which it will be compensated, but it has not suffered a "distinct and palpable injury" regarding the lost housing opportunity caused by Respondents. *See Havens* 455 U.S. at 375-77; *Warth v. Seldin*, 422 U.S. 490, 501 (1975).

Finally, the Government contends that CIL is entitled to $5,500.00 as compensation for the "frustration of corporate purpose" caused by Respondents. The Government describes three ways in which the Respondents frustrated CIL's mission to provide housing opportunities for mentally retarded people: (1) The individuals who would have resided in the Elm Street house were forced to wait for a less satisfactory alternative to be found, purchased, and renovated to meet their needs; (2) CIL was precluded from using Faust for other projects while she worked to find an alternative to the Elm Street house; and (3) Faust devoted time to this case that could have been spent furthering CIL's mission. Number (1) is the lost housing opportunity discussed above that cannot form the basis for an award to CIL. Number (2) cannot support a damage claim because Faust's development work in connection with the Buckingham Street property furthered CIL's mission while reaping a greater benefit for CIL than CIL would have earned if Respondents had not behaved unlawfully. Number (3) describes an out-of-pocket loss for which CIL will receive compensation. In short, the Government has not justified a separate award to CIL for "frustration of corporate purpose."[22]

---

[21]Faust is paid approximately $22 per hour for her services. Respondents complain that using $50 per hour as the measure of damages is therefore excessive. Because CIL's overhead costs for facilities and management and the cost of Faust's fringe benefits must be added to the cost of her salary, $50 per hour is an appropriate measure of the value of Faust's time.

[22]The Government cites three cases in support of its argument that CIL should be awarded $5,500 for "frustration of corporate purpose." In the first case, *City of Chicago v. Matchmaker Real Estate Sales Center, Inc.*, No. 88 C 9695, (N.D. Ill. Apr. 5, 1991) (LEXIS, Genfed library, Court Files), the magistrate awarded $16,500 to a nonprofit fair housing organization, the "Leadership Council," to cover the cost of investigating the case, monitoring defendant's records, auditing defendant's sales practices, and conducting several training seminars. In other words, the Leadership Council was awarded $16,500 for the diversion of resources caused by defendants. With respect to plaintiffs' claim for compensatory damages for "frustration of purpose," the memorandum opinion states:

> [T]he court believes it can best evaluate the damages caused by frustration of purpose by the compensatory damages assessed. That is, if Leadership Council was damaged in the amount of $16,500, it is reasonable to believe that diversion of its resources from other purposes must have been in approximately the same amount.

*Civil Penalties*

To vindicate the public interest, the Act authorizes an administrative law judge to impose civil penalties upon respondents who violate the Act. 42 U.S.C. Sec. 812(g)(3)(A); 24 C.F.R. Sec. 104.910(b)(3). Determining an appropriate penalty requires consideration of five factors: (1) the nature and circumstances of the violation; (2) the goal of deterrence; (3) whether the respondent has previously been adjudged to have committed unlawful housing discrimination; (4) respondent's financial resources; and (5) the degree of respondent's culpability. *See Murphy* at 25,058; *HUD v. Blackwell,* Fair Housing-Fair Lending (P-H), para 25,001 at 25,014-15 (HUDALJ Dec. 21, 1989) (hereinafter *Blackwell I*), *aff'd,* 908 F.2d 864 (11th Cir. 1990); H.Rep. No. 711, 100th Cong., 2d Sess. at 37 (1988).

*Nature and Circumstances of the Violation*

The nature and circumstances of Respondents' violations in this case do not merit a $10,000.00 civil penalty against any Respondent. Although intentional, Respondents' unlawful discrimination apparently was not motivated by malice toward CIL or RMS or the mentally retarded individuals on whose behalf CIL sought to purchase a home. Rather, Respondents' conduct appears to have been motivated solely by economic considerations.[23] Furthermore, there is no evidence that anyone suffered any emotional damages or was forced to live in unsatisfactory housing because of Respondents' discriminatory conduct.

Nevertheless, significant civil penalties should be imposed in this case. Respondents are professional housing providers who should have known that the Fair Housing Act prohibits any form of discrimination against the handicapped. Further, Respondents were provided by Faust with information showing that their fears regarding the adverse effect of a group home on surrounding property values were unfounded; even when warned by Faust that she was considering filing a discrimination complaint, Respondents persisted in their unlawful discrimination and neglected the opportunity to correct their conduct.[24]

*Deterrence*

Respondents remain in the housing business. The need to deter them from future violations of the Act is greater than it would be if they had left the industry. Imposition of an appropriate civil penalty will send a message to housing providers that discriminating against people with handicaps is "not only unlawful but expensive." *HUD v. Jerrard,* Fair Housing-Fair Lending (P-H) para. 25,005 at 25,092 (HUDALJ 04-88-0612-1, Sept. 28, 1990).

---

This opinion awards $16,500 for diversion of resources, defines "frustration of purpose" in terms of diversion of resources, then awards another $16,500 for "frustration of purpose," thereby awarding damages for the same thing twice. This case cannot be deemed persuasive authority for the argument that separate damages should be awarded to CIL for "frustration of corporate purpose" in addition to awards for diversion of its resources.

Better authority may be found for the Government's position in *Saunders,* 659 F. Supp. 1042, where the United States District Court for the Northern District of Virginia ordered payment of $10,000 to a nonprofit fair housing corporation for frustration of the corporation's mission in addition to separate damages for diversion of resources. The Court found evidence that the defendant's large-scale discriminatory advertising had caused a subtle but substantial impact on the corporation's mission of ensuring equal housing and conveying the availability of equal housing to the public. 659 F. Supp. at 1060-61. However, no analogous evidence may be found in the instant case to support a separate award for "frustration of corporate purpose."

The Government also cites *Mansards,* 597 F. Supp. 334, to support its argument. In that case the United States District Court for the Northern District of Indiana awarded $1,000 to the Northwest Indiana Open Housing Center, a nonprofit organization, for frustration of the Center's goals. This case also may be distinguished on the facts. The Court concluded that the lawsuit frustrated one of the Center's stated goals (enhancing cooperation between the Center and local landlords), while at the same time advancing another goal (promoting equal housing opportunities). 597 F. Supp. at 348. Unlike the record in *Mansards,* in the case at hand the evidence shows no frustration of CIL's purpose other than that manifested by the diversion of its resources, for which it will be compensated. In other words, as in a tort case, the damages awarded in this case will return CIL as much as possible to the condition it would be in if Respondents had not engaged in unlawfully discriminatory conduct. *See Curtis v. Loether,* 415 U.S. 189, 197 (1974); *Seaton v. Sky Realty Company, Inc.,* 491 F.2d 634, 636 (7th Cir. 1974); *Lee v. Souther Home Sites Corporation,* 429 F.2d 290, 293 (5th Cir. 1970).

[23] The owners of NWR convincingly testified that they personally bear no animosity toward the handicapped. George has done charitable work for handicapped children through a service organization. Tr.III 9. NWR sold a house next door to George's personal residence to a family with a member who has multiple sclerosis. Tr.III 10. The president of NWR, Mr. Paradis, has taught mentally retarded children in the classroom and on the baseball field. Tr.II 234-35, 237.

[24] Faust filed a housing discrimination complaint with the Connecticut Commission on Human Rights and Opportunities on June 21, 1989. Respondents' Answer to the Charge of Discrimination included a copy of a letter dated August 8, 1989, from Respondents' attorney addressed to the Commission that indicates NWR was willing at that time to negotiate with CIL for the sale of Lot 4 in connection with the settlement of that complaint. Since this letter was generated in connection with the settlement of a complaint, no conclusions or inferences can be drawn from the letter about the conduct of the parties before the complaint was filed. *See* Fed. R. Evid. 408 and 42 U.S.C. Sec. 3601(d)(1).

*Respondents' Previous Records*

There is no evidence that either Respondent in the instant case has previously been found to have committed an unlawful discriminatory housing practice. Consequently, the maximum civil penalty that may be assessed against either Respondent is $10,000.00, pursuant to 42 U.S.C. Sec. 812(g)(3)(A) and 24 C.F.R. Sec. 104.910(b)(3)(i)(A).

*Respondents' Financial Circumstances*

Evidence regarding respondents' financial circumstances is peculiarly within their knowledge, so they have the burden of introducing such evidence into the record. If they fail to produce credible evidence militating against assessment of a civil penalty, a penalty may be imposed without consideration of their financial circumstances. *See Campbell v. United States*, 365 U.S. 85, 96 (1961); *HUD v. Jerrard*, Fair Housing-Fair Lending (P-H) para. 25,005 at 25,092; *Blackwell I* at 25,015. The record does not contain any evidence indicating that George or NWR could not pay a civil penalty without suffering undue hardship.

*Culpability*

Respondents contend that the complaint should be dismissed as to George because he always acted in his corporate capacity as Secretary of NWR. That contention has no merit. George is not relieved of his obligation to obey the law by virtue of his agency. *See, e.g., Dillon v. AFBIC Development Corp.*, 597 F.2d 556, 562-63 (5th Cir. 1979); *Jenaty v. McKey & Poague, Inc.*, 496 F.2d 1119, 1120-21 (7th Cir. 1974). Even if we assume, *arguendo*, that George opposed his partners' decision to refuse to deal with CIL, one who acts as a conduit for the discriminatory goals of another is equally liable for that unlawful conduct, even if the former does not act with discriminatory animus. *Dwivedi*, 895 F.2d at 1530-31; *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1223-26 (2d Cir. 1987), *cert. denied* 486 U.S. 1055 (1988); *Diaz v. Pan Am. World Airways*, 442 F.2d 385 (5th Cir.), *cert. denied*, 404 U.S. 950 (1971).

Nevertheless, the evidence does not show that George was personally responsible in fact for the discriminatory conduct of NWR. Rather, it appears he merely implemented company policy. As he was manager of NWR, it was appropriate to name him as a separate respondent in this case, but it would not be appropriate to impose a separate civil penalty against George personally in the absence of evidence that he was primarily responsible for the decision not to sell a house to CIL.

As developers, NWR and George were in a position where they could deprive homeseekers of an equal opportunity to buy housing, which is exactly what they did. That they apparently acted solely out of economic considerations is no excuse. This is precisely the kind of practice Congress sought to eliminate entirely from the real estate trade through the Fair Housing Act. A large civil penalty must be imposed. The Government requests a total of $10,000.00 in civil penalties against Respondents, but maximum penalties should be reserved for the most egregious cases where the victims of discrimination suffer grievous harm. This case does not fall in that category. A civil penalty of $7,500.00 will be imposed on NWR.

*Injunctive Relief*

An administrative law judge may order injunctive or other equitable relief to make a complainant whole and protect the public interest in fair housing.[25] 42 U.S.C. Sec. 3612(g)(3). The purposes of injunctive relief include: eliminating the effects of past discrimination, preventing future discrimination, and positioning aggrieved persons as closely as possible to the situation they would have been in but for the discrimination. *See Park View Heights Corp. v. City of Black Jack*, 605 F.2d 1033, 1036 (8th Cir. 1979), *cert. denied*, 445 U.S. 905 (1980), *reh. denied*, 423 U.S. 884 (1975). Once a judge has determined that discrimination has occurred, he or she has "the power as well as the duty to 'use any available remedy to make good the wrong done.'" *Moore v. Townsend*, 525 F.2d 482, 485 (7th Cir. 1985) (citations omitted). The injunctive provisions of the following Order serve all of these purposes.

*Conclusion*

The preponderance of the evidence shows that Respondents discriminated against Complainant CIL on the basis of handicap, in violation of sections 804(c) and (f)(1) of the Act. Complainant CIL suffered actual damages for which it will receive a compensatory award. Further, to vindicate the public interest, injunctive relief will be ordered, as well as a civil penalty against Respondent NWR.

[25] "Injunctive relief should be structured to achieve the twin goals of insuring that the Act is not violated in the future and removing any lingering effects of past discrimination." *HUD v. Blackwell*, 908 F.2d, 864, 875 (11th Cir. 1990) (quoting *Marable v. Walker*, 704 F.2d 1219, 1221 (11th Cir. 1983)).

© 1991 PH, Inc. Fair Housing—Fair Lending

*Order*

It is hereby **ORDERED** that:

1. Respondent Duane George and Northwest Realty Group, Inc., and their agents and employees are hereby permanently enjoined from discriminating with respect to housing because of race, color, religion, sex, familial status, national origin, or handicap. Prohibited actions include, but are not limited to:

   a. refusing or failing to sell or refusing to negotiate for the sale of a dwelling to any person because of race, color, religion, sex, familial status, national origin, or handicap;

   b. otherwise making unavailable or denying a dwelling to any person because of race, color, religion, sex, familial status, national origin, or handicap;

   c. discriminating against any person in the terms, conditions, or privileges of sale of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, national origin, or handicap;

   d. making, printing or publishing, or causing to be made, printed or published, any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, familial status, national origin, or handicap;

   e. coercing, intimidating, threatening, or interfering with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by the Fair Housing Act; and

   f. retaliating against the Corporation for Independent Living or anyone else for their participation in this case or for any matter related thereto.

2. Respondents Duane George and Northwest Realty Group, Inc., and its agents and employees, shall cease to employ any policies or practices that discriminate against handicapped persons in the provision of housing.

3. Respondents Duane George and Northwest Realty Group, Inc., and its agents and employees, shall refrain from using any advertisements or making any statements that indicate a discriminatory preference or limitation based on handicap.

4. Consistent with 24 C.F.R. Part 109, Northwest Realty Group, Inc., shall display the HUD fair housing logo and slogan in all advertising and documents routinely provided to the public. Consistent with 24 C.F.R. Part 110, Northwest Realty Group, Inc., shall display the HUD fair housing poster in a prominent place in its principal office, and any other offices where Northwest Realty Group, Inc., conducts business.

5. Northwest Realty Group, Inc., shall institute internal record-keeping procedures, with respect to the sale of any real property sold for residential purposes or any other real property acquired by Northwest Realty Group, Inc., or by Duane George for the purpose of selling as housing for residential use, which are adequate to comply with the requirements set forth in this Order. These will include keeping all records described in this Order. Northwest Realty Group, Inc., will permit representatives of HUD to inspect and copy all pertinent records at any and all reasonable times and upon reasonable notice. Representatives of HUD shall endeavor to minimize any inconvenience to Northwest Realty Group, Inc., from the inspection of such records.

6. On the last day of every second month (six times per year), beginning at the end of the second month after this Order becomes final, and continuing for three years from the date this Order becomes final, Northwest Realty Group, Inc., shall submit reports containing the following information to HUD's Boston Regional Office of Fair Housing and Equal Opportunity, 10 Causeway Street, Room 375, Boston, Massachusetts 02222-1092:

   a. copies of listings for any properties (lots or houses) which Northwest Realty Group, Inc., or Duane George owns or in which they control an interest;

   b. a list of any houses or lots owned or in the control of Northwest Realty Group, Inc., or Duane George, which either party is marketing for residential use, specifying for each property or house: its address, lot size, price, style of house, number of bedrooms in the unit, and, with respect to vacant lots, the status of any approvals required from local authorities before final purchase agreements can be executed;

   c. Sample copies of advertisements for houses, lots, or subdivision published during the reporting period, specifying the dates and media used or, if applicable, a statement that no advertisements have been published during the reporting period;

   d. Sample copies of any promotional materials for houses, lots, or subdivisions published during the reporting period, specifying the dates and media used or, if applicable, a statement that no promo-

tional materials have been published during the reporting period.

7. Within ten days of the date on which this Order becomes final, Respondents shall pay actual damages to the Corporation for Independent Living in the amount of $4,350.

8. Within ten days of the date on which this Order becomes final, Respondent Northwest Realty Group, Inc., shall pay a civil penalty of $7,500 to the Secretary of HUD.

9. Within ten days of the date this Order becomes final, Respondent Northwest Realty Group, Inc., shall inform all of its agents and employees of the terms of this Order and educate them as to such terms and as to the requirements of the Fair Housing Act. All new employees shall be informed of such no later than the evening of their first day of employmen..

10. Within 15 days of the date of this Order, Respondent Northwest Realty Group, Inc., shall submit a report to this tribunal detailing the steps taken to comply with this Order.

This order is entered pursuant to 42 U.S.C. Sec. 3612(g)(3) of the Fair Housing Act and the regulations codified at 24 C.F.R. Sec. 104.910, and will become final upon the expiration of thirty (30) days or the affirmance, in whole or in part, by the Secretary within that time.

[¶25,011] **HUD v. Downs**, No. HU-DALJ 02-89-0322-1/02-89-0325-1 (HUD Office of Admin. Law Judges 9-20-91)

**(1) HUD secretary failed to demonstrate that respondent's articulated reason for not renting apartment to single mother with one child and misrepresenting the availability of apartment was a pretext for illegal family status discrimination.**

**(2) HUD secretary failed to demonstrate that respondent's statement that a "noisy child" was unwelcome and question about the age of prospective tenant's child were illegitimate. Respondents were entitled to ask questions designed to locate quiet tenants for upper flat of building occupied by elderly tenants.**

## INITIAL DECISION AND ORDER

This matter arose as a result of complaints of discrimination based upon familial status in violation of the Fair Housing Act as amended, 42 U.S.C. §§ 3601, *et seq.* ("Fair Housing Act" or "Act") and 24 C.F.R. Parts 103 and 104. The complaints were filed with the Department of Housing and Urban Development ("the Department " or "HUD") on July 5, 1989. A determination of Reasonable Cause was made and a Charge of Discrimination filed on behalf of the Complainants by the Secretary of the Department ("Secretary" or "the Government") on February 28, 1991. A hearing was held in Buffalo, New York on May 22 and 23, 1991. Post-hearing briefs were filed by the parties on July 8, 1991. Reply briefs were filed on July 22, 1991.

The Secretary alleges that Respondents Mary Jean Downs and Professional Realty Service, Inc. ("PRS"): 1) refused to lease or negotiate the rental of, or otherwise made unavailable, the upper story of a two-family dwelling located at 431 Bird Avenue, Buffalo, New York, to Complainant Sherry Soules and Robin Barnes, a "tester" for Complainant Housing Opportunities Made Equal ("HOME"), because of familial status in violation of 42 U.S.C. § 3604(a); 2) made statements indicating a discriminatory preference based upon familial status in violation of 42 U.S.C. § 3604(c); and 3) represented to Ms. Soules and Ms. Barnes that a dwelling was not available when a dwelling was, in fact, available, in violation of 42 U.S.C. § 3604(d). The Secretary further alleges that Respondents engaged in real estate transactions which discriminated based on familial status in violation of 42 U.S.C. § 3605(a).

The Secretary seeks damages for Ms. Soules in the amounts of $7,500 for inconvenience, $3,000 for lost housing opportunity, and $12,500 for emotional distress. The Secretary also seeks damages for Complainant HOME in the amounts of $1,876.75 for out-of-pocket expenses, $5,000 for the frustration of HOME's purpose, and $1,109 to compensate HOME for its future monitoring and testing of Respondents. Finally, the Secretary seeks civil penalties totaling $10,000.

Respondents admit that they did not make the apartment on Bird Avenue available to Ms. Soules. They contend that their actions resulted not from Ms. Soules' familial status, but, rather, from Respondent Downs' negative reaction to Ms. Soules' questioning during a telephone conversation. Respondents also assert that they were not unwilling to rent the Bird Avenue apartment to Ms. Barnes and that the Secretary has been unable to prove their unwillingness.[1]

[1] Respondents also assert that evidence in the record reveals a failure to meet the mandatory conciliation requirement, set forth at 42 U.S.C. § 3601(b)(1), and that this requirement is mandatory, hence jurisdictional Res Reply Brief at pp. 18-19. A similar argument was addressed in the case of *HUD v Morgan*, HUDALJ 08-89-0077-1, slip

**[¶16,305] Niederhauser v. Independence Square Housing**, No. C 96-20504 RMW, (N.D. Cal. 8-27-98)

**(1) Disabled tenants may have standing to challenge an apartment complex's rules and policies even though they have not yet suffered damages if they are threatened with injury that is about to occur.**

**(2) A Section 202 housing project may tailor itself to persons in one or more categories of disabilities but it may not discriminate against a person solely because the person falls into another category of disability in addition to the category for which the complex was intended.**

**(3) Landlords of a Section 202 project may inquire about an applicant's disabilities to determine whether the appliant meets the qualifications for tenancy, but must use the least invasive means necessary to make their inquiries; they may not inquire into the nature and extent of an applicant's disabilities beyond what is necessary to determine eligibility for the housing.**

Plaintiffs' motion for summary adjudication was submitted on the papers. The court has read the moving and responding papers.[1] For the reasons set forth below, the court grants in part and denies in part plaintiffs' motion for summary adjudication.

## I. BACKGROUND

Plaintiffs Sydney and Rhoda Niederhauser bring this action against Independence Square Housing Corporation ("ISHC"), Doris Harbert, and Judith Sargent alleging violations of the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3600 et seq. ("FHAA"), section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and corresponding provisions of California state law, Government Code sections 12900 *et. seq.*, Civil Code sections 51 *et, seq.*, and Civil Code section 54.1. They also seek relief under California Civil Code sections 789.3(b)(1) and 1942.5(c) for defendants' alleged interference with their tenants' rights.

In the current motion plaintiffs seek injunctive and declaratory relief on their first, second and fifth through eighth claims. Specifically, they claim they are entitled to summary adjudication that the written occupancy policies used by defendants from 1993 through the present have violated and continue to violate the above-identified federal and state laws prohibiting disability discrimination. Plaintiffs also seek summary adjudication that the policy involving confiscation of tenants' card keys has violated and continues to violate their tenancy occupancy rights.

Defendant ISHC is a private non-profit corporation which receives federal monetary assistance from the U.S. Department of Housing and Urban Development ("HUD"). ISHC owns and operates Independence Square ("IS"), a 100-unit apartment complex providing low income housing to elderly and disabled families. IS was designed and architecturally modified to support a population of physically disabled and elderly adult tenants. Defendant Judith Sargent is the general manager of IS. Defendant Doris Harbert was a tenant consultant to the general manager from January 1, 1989 through February 1997.

Plaintiffs contend that IS is a "dwelling" covered by the FHAA and the Rehabilitation Act and that ISHC is a "program or activity" receiving federal financial assistance within the meaning of section 504 of the Rehabilitation Act. Defendants, on the other hand, contend that IS is not a "standard apartment complex, undeniably subject to the broad, anti-discrimination laws, imposed by the FHAA." Opposition at 2. Defendants contend that IS is a Section 202 project, "specifically designed and permitted by law to serve the physically handicapped and elderly." *Id.; see also* 12 U.S.C. § 1701q(a)(1).

The Niederhausers are a married, elderly couple who have been tenants of IS, a federally subsidized housing complex, since 1979. The Niederhausers are each over 70 years of age and both disabled due to cerebral palsy which affects their abilities to speak, walk, and carry out daily living activities. On May 1, 1979, plaintiffs executed a rental agreement providing for a one-year lease of a two-bedroom apartment at IS and for federal rent subsidization under Section 8 of the United States Housing Act of 1937. This rental agreement was renewed

[1] The court did consider the supplemental papers filed by defendants which included excerpts from the deposition of Sydney Niederhauser and a copy of the opinion in *Cooper v. St. Martin Manor Inc.*, 1998 U.S. Dist. LEXIS 1114 (E.D. LA 1998). The court, however, agrees with plaintiffs that the deposition excerpts are largely irrelevant to the instant motion and that the *Cooper* decision adds nothing to the law previously cited to the court.

© 1998 Aspen Law & Business

by ISHC each year through 1993. In March 1993, Mr. Niederhauser was admitted to Watsonville Community Hospital for surgery. In late July 1993, ISHC transferred Mrs. Niederhauser from the two-bedroom apartment to a one-bedroom apartment at IS. On May 27, 1996, Mr. Niederhauser returned to IS to reside with his wife in the one bedroom apartment, where they currently reside.

### A. ISHC's TENANCY POLICIES 1985–1997

Plaintiffs claim that a number of ISHC's tenancy policies in effect from January 1, 1985 to August 1, 1997 and embodied in the Rental Agreement, Qualifications for Tenancy, and Occupancy Rules and Regulations were illegal. According to plaintiffs, the offending policies were given to tenants at IS when their lease agreements were executed. The Qualifications for Tenancy required that IS tenants must (1) "be capable of tending to their needs independently and be able to transfer, bathe, cook and feed themselves;" (2) "be able to be self-sufficient mentally and emotionally and be able to conduct their own affairs, such as paying their own rent, hiring and terminating, if necessary, and supervising their own chore worker;" and (3) "demonstrate and have a successful history of living independently on their own, without an attendant or 'relative' care." In 1989, ISHC modified its tenancy eligibility policies requiring that an "applicant must be able to live independently if disabled, commensurate with the use of our special architecture and environment features."

In January 1996, ISHC questioned Mrs. Niederhauser's ability to meet ISHC's tenancy requirements. While Mrs. Niederhauser was recuperating from arm surgery, ISHC's attorney sent her a reminder that IS residents must be self-sufficient. On March 21, 1996, ISHC's attorney also wrote Mrs. Niederhauser a letter indicating that her husband did not appear to meet the minimum tenancy requirements since "he is not self-sufficient [and] does not have a successful history of living independently on his own." In April 1996, ISHC's attorney further informed Mrs. Niederhauser that IS would not accept her husband as an occupant and suggested that they seek another residence.

Despite these letters, Mr. Niederhauser moved back into IS on May 27, 1996. On June 8, 1996, ISHC management allegedly asked Mr. Niederhauser to demonstrate that he could transfer to and from his wheelchair without help and could live independently including tending to his own bathroom needs. Harbert and Sargent were satisfied that Mr. Niederhauser met the eligibility requirements and offered plaintiffs a downstairs apartment with a fully accessible kitchen and shower. However, Harbert and Sargent received a letter from the Niederhausers' attorney rejecting their offer and requesting that they no longer talk to plaintiffs.

Although no showing has been made that ISHC's tenant application procedures were actually applied to the Niederhausers, plaintiffs complain about them. They contend that prospective tenants were required to sign an Authorization of Release of Medical Information which IS would forward to the prospective tenant's physician to obtain his or her medical information. Applicants were also asked to complete a Physical Disability Inventory containing detailed inquiries into health histories and needs, medications, personal care arrangements and their ability to perform daily living activities. IS apparently relied on this information in its decisions to accept or reject applicants.

Defendants contend that the written policies during this period did not reflect ISHC's actual practices at IS. They say that ISHC's policies changed as they became aware of various changes in the regulations promulgated by HUD. Defendants also contend that according to HUD, ISHC's rules were satisfactory as late as May 1996. Sargent Decl. ¶ 7, Ex. D. Defendants also contend that notwithstanding their written policies, IS has allowed live-in aides in appropriate circumstances.[2]

### B. ISHC's TENANCY POLICIES 1997–PRESENT

On August 1, 1997, ISHC adopted new tenancy policies. Plaintiffs contend that ISHC's new policies suffer from the same problems that the earlier version had. Among other provisions, plaintiffs challenge ISHC's so-called Statement of Purpose providing that IS

> does not . . . accept or retain residents who demonstrate any level of need for care and supervision services (beyond those 'based on a licensed physician's certification provided by the tenant family, to be essential to their care or well-being,'. . . . A person may be considered **Capable of Fulfilling the Lease Requirements** (free from the need for licensed residential care) if that person can meet all their needs, can fulfill the lease agreement or has pro-

[2] Although defendants cite the entire Sargent Declaration, nothing in that declaration supports this factual proposition.

vided for any assistance necessary for all of the following activities:

> Household, meal preparation and clean-up, laundry, taking of medications, money management, appropriate transportation, correspondence, telephoning, dressing, feeding, toiletting, bathing, transferring, planning, and decision making.

Molina Decl. ¶ 4, Ex. 3.

Plaintiffs also contend that in order to determine eligibility requirements, ISHC continues to inquire into the nature and extent of applicants' disabilities and requires tenants to voluntarily terminate their tenancy if they have progressively deteriorating diseases. Plaintiffs further argue that ISHC's policy of excluding tenants with developmental disabilities or persons requiring 24-hour care violates the FHAA.

### C. KEY CARD CONFISCATION POLICY

ISHC's Tenancy Rules and Regulations provided from January 1985 through August 1, 1997 that a tenant's key card, providing entry through the front gate and side entrances, would be confiscated if the key card were used by anyone other than an IS tenant. The Niederhausers contend that on June 4, 1996 ISHC confiscated their key card as they entered IS because Diane Tanner, a friend of theirs, actually used the card to help them enter the complex. Defendants point out that plaintiffs' keycard was ultimately returned. Plaintiffs also state that under new policies, a tenant's key card will be not be confiscated when used by a non-tenant, unless the non-tenant is assisting the non-tenant in entering or leaving the building. Defendants point out, however, that confiscation of a key card does not preclude access to IS. Rather, tenants without key cards are buzzed in from the front desk at any time of day or night.

## II. LEGAL STANDARDS FOR SUMMARY JUDGMENT AND INJUNCTIVE RELIEF

### A. SUMMARY JUDGMENT

Summary judgment is proper if the record indicates there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. § 56(c). A genuine issue of material fact exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2510 (1986). The nonmoving party must reference specific facts to create a triable issue of fact. *T.W. Elec. Serv. v. Pacific Elec. Contractors*, 809 F.2d 626, 630 (9th Cir. 1987). The court views all evidence in a light most favorable to the nonmoving party. *Masson v. New Yorker Magazine, Inc.*, 111 S. Ct. 2419, 2434–35 (1991). However, "the mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson*, 106 S. Ct. at 2512. Credibility determinations, weighing evidence, and drawing inferences are jury functions, not those of a judge deciding a motion for summary judgment. *Liberty Lobby*, 106 S. Ct. at 2513. The evidence of the nonmoving party is to be believed, and all justifiable inferences are to be drawn in its favor. *Id.*

### B. INJUNCTIVE RELIEF

> In a civil action under subsection (a) of [42 U.S.C. § 3613], if the court finds that a discriminatory housing practice has occurred or is about to occur, the court may award to the plaintiff actual and punitive damages, and subject to subsection (d) of this section, may grant as relief, as the court deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action, as may be appropriate).

42 U.S.C. § 3613(c)(1).

"So when a plaintiff alleges that the defendants have engaged in a prohibited discriminatory practice, all that is needed to support an injunction is proof that the practice exists." *Topic v. Circle Realty Co.*, 377 F. Supp. 111, 114 (C.D. Cal. 1574) *rev'd on other grounds*, 532 F.2d 1273 (9th Cir. 1975), *cert. denied*, 429 U.S. 859 (1976). "[I]rreparable injury may be presumed from the fact of discrimination and violations of fair housing statutes." *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1423 (11th Cir. 1984).

## III. ANALYSIS

### A. STANDING

Defendants contend that the Niederhausers lack standing to obtain injunctive relief since they have never been denied tenancy at IS and continue to live there even now. Defendants also contend that ISHC's current tenancy rules comply with HUD regulations and all relevant discrimination laws. However, the court finds that plaintiffs do have standing since they are threatened by the very tenancy rules and

△ © 1998 Aspen Law & Business

policies which are at issue in this case. *See* 42 U.S.C. § 3602(i) ("'Aggrieved person' includes any person who — (1) claims to have been injured by a discriminatory housing practice; or (2) believes that such person will be injured by a discriminatory housing practice that is about to occur.")

**B. DISCRIMINATION LAWS RELEVANT TO SECTION 202 HOUSING PROJECT**

Defendants submit that IS, as a Section 202 Housing Project specifically designed to accommodate the physically disabled and elderly, is subject to more relaxed standards relating to discrimination laws and regulations. Defendants also argue that a Section 202 Project can tailor itself to persons within one category of HUD's regulations, while excluding others. Finally, defendants contend that HUD regulations permit IS to inquire into an applicant's medical history to the extent necessary to determine eligibility.

1. *Relevant Discrimination Laws*

a. *Fair Housing Amendment Act*

The FHAA proscribes discrimination "in the sale or rental of a dwelling to any buyer or renter" because of a handicap. 42 U.S.C. § 3604(f)(1). The FHAA also prohibits discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling" based on that person's disability. 42 U.S.C. § 3604(f)(2). Occupancy conditions and rules incorporated into a tenant's rental agreement are terms or conditions of rental within the meaning of section 3604(f)(2). *See Samuelson v. Mid-Atlantic Realty Co., Inc.*, 947 F. Supp. 756, 761 (D. Del. 1996).

b. *Section 504 of the Rehabilitation Act*

> No otherwise qualified individual with a disability in the United States, as defined in section 706(8) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . .

29 U.S.C. § 794(a).

c. *Requirements of Section 202 Housing Projects*

A Section 202 Housing Project may actually discriminate based on age or disability but only in a manner otherwise consistent with the FHAA and the Rehabilitation Act. Thus, a Section 202 Housing Project may tailor itself to persons in one or more of the following Section 202 categories: elderly, developmentally disabled, chronically mentally ill, or physically handicapped and exclude those persons not falling within the selected category or categories. *See Knutzen v. Eben Ezer Lutheran Housing Center*, 815 F.2d 1343, 1349, 1353 (10th Cir. 1987); *Brecker v. Queens B'nai B'rith Housing Development Fund Co.*, 798 F.2d 52, 56 (2d Cir. 1986). However, a Section 202 Project intended for persons who are elderly or have physical disabilities, for example, may not deny housing to an elderly person *solely* because that person is developmentally disabled as well. *See U.S. v. Forest Dale, Inc.*, 818 F. Supp. 954, 963–65 (N.D. Tex. 1993); *see also Knutzen*, 815 F.2d at 1353 n. 9. In that circumstance, it appears that the Section 202 Project, like any other program receiving federal funds, is required to determine whether it could reasonably accommodate that applicant. *See* 42 U.S.C. § 3604(f)(3); *see generally U.S. v. California Mobile Home Park Management Co.*, 29 F.3d 1413, 1416–18 (9th Cir. 1994) (failure to make reasonable accommodations in rules or policies violates the FHAA).

2. *Permissible Inquiries to Prospective Tenants*

Section 202 Housing Projects must comply with certain restrictions on the nature and extent of inquiries to housing applicants.

> It shall be unlawful to make an inquiry to determine whether an applicant for a dwelling, a person intending to reside in that dwelling after it is so sold, rented or made available, or any person associated with that person, has a handicap or to make inquiry as to the nature or severity of a handicap of such a person. However, this paragraph does not prohibit the following inquiries, provided these inquiries are made of all applicants, whether or not they have handicaps:
>
> (1) Inquiry into an applicant's ability to meet the requirements of ownership or tenancy;
>
> (2) Inquiry to determine whether an applicant is qualified for a dwelling available only to persons with handicaps or to persons with a particular type of handicap.

24 C.F.R. § 100.202(c).

However, Section 202 Projects are required to verify information provided by an applicant for housing.

> (a) General. Adequate procedures must be developed to obtain and verify

information with respect to each applicant. . . .

(b) Suggested sources of information. Sources of information may include, but are not limited to, the applicant (by means of interviews or home visits), landlords, employers, family social workers, parole officers, court records, drug treatment centers, clinics, physicians or police departments where warranted by the particular circumstances.

24 C.F.R. § 960.206.

The legislative history of the FHAA makes clear that a dwelling need not be made available to an individual "whose tenancy would constitute a direct threat to the health or safety of other individuals or whose tenancy would result in substantial physical damage to the property of others." 42 U.S.C. § 3604(f)(9). However,

> [42 U.S.C. § 3604(f)(9)] is not intended to give landlords and owners the right to ask prospective tenants and buyers blanket questions about the individuals' [sic] disabilities. Under Section 504 of the Rehabilitation Act, employers may not inquire, as part of pre-employment inquiries, whether an applicant is a handicapped person or as to the nature or severity of the handicap. Employers may only make pre-employment inquiries into an applicant's ability to perform job-related functions. Similarly, under this provision, only an inquiry into a prospective tenant's ability to meet tenancy requirements would be justified. Thus, in assessing an application for tenancy, a landlord or owner may ask an individual the questions that he or she asks of all other applicants that relate directly to the tenancy (e.g., questions relating to rental history or a targeted inquiry as to whether the individual has engaged in acts that would pose a direct threat to the health or safety of other tenants), but may not ask blanket questions with regard to whether the individual has a disability. Nor may the landlord or owner ask the applicant or tenant questions which would require the applicant or tenant to waive his right to confidentiality concerning his medical condition or history. The only exception is that a landlord or owner may ask whether the individual is a current illegal abuser or addict of controlled substances.

H.R. Rep. No. 100-711, at 30 (1988), reprinted in 1988 U.S.C.C.A.N. 1762, 2191.

In summary, landlords of a Section 202 Project may make inquiries about an applicant's disabilities to determine whether an applicant meets its qualifications for tenancy. 24 C.F.R. § 100.202(c)(2). Information may also be sought to verify an applicant's purported qualifications. However, the legislative history of the FHAA and the HUD regulations show that an applicant's privacy rights are to be preserved to the extent possible and that a landlord should use the least invasive means necessary to verify an applicant's qualifications. *See* H. Rep. No. 100-711 at 30 ("Nor may the landlord or owner ask the applicant or tenant questions which would require the applicant or tenant to waive his right to confidentiality concerning his medical condition or history."); 24 C.F.R. § 960.206(b) ("Sources of information may include, but are not limited to, the applicant (by means of interviews or home visits), landlords, employers, family social workers, parole officers, court records, drug treatment centers, clinics, physicians or police departments *where warranted by the particular circumstances*.") (emphasis added).

Although a landlord may make necessary inquiries to determine an applicant's qualifications for tenancy, the landlord may not inquire into the nature and extent of an applicant's or tenant's disabilities beyond that necessary to determine eligibility. For example, if an applicant applies for tenancy at a Section 202 Project intended for the elderly, the applicant may be asked whether that person meets the minimum age requirement and whether that person is otherwise qualified for tenancy; e.g., ability to pay rent. However, it does not appear that the applicant can be asked if he or she can live independently since this is not an eligibility criterion. *See Cason v. Rochester Housing Authority*, 748 F. Supp. 1002, 1008–09 (W.D.N.Y. 1990).[3]

3. *Discriminatory Notices*

Regardless of a landlord's actual policies or practices, the FHAA prohibits the publication of written policies which indicate disability-based discrimination. More precisely, the FHAA deems it unlawful to

> make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color,

[3] Even though *Cason* did not involve a Section 202 Housing Project, the court finds its reasoning persuasive since Section 202 Housing Projects are still subject to the requirements of the FHAA, the Rehabilitation Act and HUD's regulations.

△ © 1998 Aspen Law & Business

> religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination.

42 U.S.C. § 3604(c).

### C. ISHC's PAST AND CURRENT TENANCY RULES AND POLICIES

Plaintiffs claim that the written occupancy policies used by defendants from 1993 through the present have violated and continue to violate the FHAA, and in particular, 42 U.S.C. §§ 3604(c) and 3604(f), and section 504 of the Rehabilitation Act.

1. *ISHC's Tenancy Rules 1985–1997*

Plaintiffs identify a number of ISHC's pre-1997 written policies as violative of federal law. In particular, plaintiffs challenge ISHC's occupancy criteria requiring that tenants be able to meet their personal care, financial, and other needs independently, without outside assistance. *See* Molina Decl. Ex. 3 (Sargent Depo. Ex. 63 at 2). Plaintiffs argue that complete self-sufficiency and independence are not requirements which a landlord may impose. Further, inquiring into the nature and severity of disabilities of tenants and applicants is too intrusive and goes beyond what is required to determine eligibility at IS. Plaintiffs also argue that ISHC's policy of excluding the developmentally disabled violates the FHAA. Lastly, plaintiffs attack ISHC's policy that tenants with "progressively deteriorating diseases or conditions which will eventually prevent them from complying with all qualifications for tenancy must authorize, in writing, that they will voluntarily terminate their tenancy at [IS] if their physical and/or mental condition renders them unable to meet tenancy qualifications." *See* Molina Decl. Ex. 3 (Sargent Depo. Ex. 59).

Defendants do not directly respond to plaintiffs' contentions and appear not to contest that the above-cited written policies violated the FHAA and the Rehabilitation Act. Rather, defendants explain that those policies were changed in August 1997. Defendants also argue that, although the written policies may have violated federal discrimination laws, the actual practices and policies at IS did comply with then applicable legal requirements. Opposition at 2–3. In support of this contention, defendants point out that the Niederhausers have never been denied tenancy at IS. However, defendants' arguments do not address the language of 42 U.S.C. § 3604(c) which prohibits the publication of discriminatory notices and policies. Further, plaintiffs faced the threat of application of the policies. Accordingly, defendants fail to raise a triable issue of fact as to whether ISHC's pre-1997 written policies violated 42 U.S.C. § 3604(c) and the Rehabilitation Act. The court, therefore, grants plaintiffs' motion for summary adjudication to the extent that plaintiffs seek a declaration that the above-identified ISHC policies violated federal law and an injunction prohibiting their enforcement.[4]

2. *ISHC's Present Policies*

Plaintiffs challenge ISHC's current Statement of Purpose in its Tenant Selection Plan as being discriminatory. The allegedly discriminatory portion of the Statement of Purpose provides that IS "does not . . . accept or retain residents who demonstrate any level of need for care and supervision services (beyond those 'based on a licensed physician's certifications provided by the tenant family, to be essential to their care or well-being,')."[5]

*See* Molina Decl. Ex. 3 (Sargent Depo. Ex. 58, Tenant Selection Plan at 7). Plaintiffs argue that tenants with disabilities may not be restricted from receiving home care. Plaintiffs also assert that a landlord may not require a physician's certification as a condition to a tenant's receiving assistance at home. Although plaintiffs cite no authority for these specific propositions, defendants do not appear to disagree.

Plaintiffs also challenge ISHC's lease requirements that a tenant meet all needs, either independently or through any assistance necessary for all the following activities:

> Household, meal preparation and clean-up, laundry, taking of medications, money management, appropriate transportation, correspondence, telephoning, dressing, feeding, toiletting, bathing, transferring, planning, and decision making.

*See* Molina Decl. Ex. 3 (Sargent Depo, Ex. 58, Tenant Selection Plan at 7). Plaintiffs argue that requiring IS applicants to certify that they can meet these requirements is based on "false and overprotective assumptions" and, therefore, is discriminatory.

Defendants assert that these inquiries are merely designed to ascertain whether a particular applicant is developmentally disabled and are proper since IS is not required

[4] The court, however, makes no determination as to whether the Niederhausers suffered injury as a result of any discriminatory publication. Declaratory and injunctive relief are appropriate because of the publication and threat of application.

[5] The court finds this statement of purpose ambiguous.

to and, indeed, excludes applicants with developmental disabilities. Plaintiffs respond that any inquiries into tenants' and applicants' personal lives, including hygiene, personal care, and medical needs are improper because defendants are not permitted to exclude people with developmental disabilities who otherwise meet IS's eligibility requirements.

As discussed above, ISHC is allowed to make inquiries of an applicant or tenant only to the extent necessary to determine whether that person qualifies for tenancy at IS. *See* 24 C.F.R. § 100.202(c); *Cason v. Rochester Housing Authority,* 748 F. Supp. 1002, 1008–09 (W.D.N.Y. 1990).[6] It follows that ISHC's policies of inquiring into the ability of an applicant or tenant to meet his or her personal needs, including such detailed inquiries as personal hygiene and toiletting practices, violates the FHAA. As defendants admit, these inquiries are designed to determine whether an applicant or tenant is developmentally disabled. The two eligibility categories at IS are the "elderly" and "physically disabled." Therefore, limited inquiries sufficient to determine whether an applicant or tenant qualifies as elderly or physically disabled are proper. *See* 24 C. F.R. § 100.202(c)(2).[7] However, if an applicant is "otherwise qualified," i.e. elderly or physically handicapped, whether that same applicant is also developmentally disabled is irrelevant to eligibility status. Indeed, if an applicant is otherwise qualified, ISHC may not deny him or her an available space simply because that applicant is also developmentally disabled. *See U.S. v. Forest Dale Inc.,* 818 F. Supp. at 963–65; *See also Knutzen,* 815 F.2d at 1353 n.9. Therefore, ISHC's policy that tenants certify that they can meet their personal needs appears to contravene 24 C.F.R. § 100.202 and federal discrimination laws. Defendants' arguments to the effect that IS does not have the capability to meet the needs of the developmentally disabled appears to be based on "generalized perceptions about disabilities and unfounded speculations." *See Cason,* 748 F. Supp. at 1009 (citations omitted). IS does not have, however, any obligation to provide special services for developmentally disabled tenants.[8] Plaintiffs are entitled to summary adjudication to the extent that plaintiffs seek a declaration that the above-identified ISHC policies violate federal law and an injunction prohibiting their enforcement.

**D. CALIFORNIA DISABILITY DISCRIMINATION LAW**

The California Fair Employment and Housing Act contains a provision which is substantially similar to 42 U.S.C. § 3604(c). *See* Cal. Gov. Code § 12955(c). *See also* Cal. Civ. Code §§ 51 *et seq.* and 54. Therefore, the court finds that ISHC's past and present written tenancy rules and policies identified above also violate California law.

**E. INTERFERENCE WITH OCCUPANCY RIGHTS**

Plaintiffs argue that ISHC's application of its key card policy to plaintiffs interfered with their occupancy rights and were retaliatory. *See* Cal. Civ. Code §§ 789.3 and 1945.2(c). The covenant of quiet enjoyment and possession is implied into residential leases. Cal. Civ. Code § 1927. The covenant of quiet enjoyment is breached when there is a substantial and material interference with a tenant's beneficial use and enjoyment of the premises. *Lee v. Placer Title Co.,* 28 Cal. App. 4th 503, 512 (1994). For example, the covenant is breached when a landlord interferes with the tenant's right of ingress and egress. *Donoghue v. Kremmel,* 121 Cal. App. 208, 211 (1932).

Defendants contend that the application of the key card policy does not wrongfully interfere with a tenant's occupancy rights since tenants without key cards may be buzzed in by IS's 24-hour staff stationed at the front door. Sargent Decl. ¶ 6. Defendants also point out that the Niederhausers' key card was returned to them within two days of its confiscation. Sydney Niederhauser Decl. ¶ 11. Although plaintiffs argue that they were restricted from using the two side entrances and that the 24-hour staff was not always immediately present at the door, defendants cite evidence sufficient to create a triable issue of fact as to whether defendants wrongfully interfered with the Niederhausers right of ingress and egress.

Therefore, the court denies plaintiffs'

[6] In addition, IS's Section 202 status does not appear to entirely relieve it of the more general proscription of 24 C.F.R. § 100.202(c) rendering unlawful the practice of making "an inquiry to determine whether an applicant . . . has a handicap or [an] inquiry as to the nature or severity of [the] handicap."

[7] Inquiry that is directed to all applicants and limited to determining whether their tenancy would pose "a direct threat to the health or safety of other individuals or . . . would result in substantial physical damage to the property of others" would also appear to be appropriate. 42 U.S.C. § 3604(f)(9).

[8] Nothing in this opinion should be construed as prohibiting defendants from making reasonable inquiry or requesting specific medical documentation to verify the severity of a disability of a person seeking a reasonable accommodation.

△ © 1998 Aspen Law & Business

motion for summary adjudication on plaintiffs' claim for interference with occupancy rights and retaliation.

### IV. ORDER

In light of the foregoing, the court grants plaintiffs' motion for summary adjudication in part and declares:

Defendant Independence Housing Square Corporation, Inc.'s ("IHSC's") tenancy policies and rules, in effect from 1985 through August 1, 1997, and those tenancy policies and rules effective since August 1, 1997, unlawfully discriminate on the basis of disability insofar as they call for inquiries into the nature and severity of the disabilities of prospective tenants which are unrelated to eligibility requirements for tenancy in Independence Square ("IS") and require the disclosure of confidential personal and medical information. Defendants may ask questions to determine if the prospective tenants fall within one of the groups IS was set up to serve, specifically the elderly or people with physical disabilities; may inform applicants who fall within one of these two eligible groups that IS does not provide personal care services to meet the needs of people with severe physical disabilities or people who have other disabilities (e.g., developmental or psychiatric disabilities); may inquire to determine the extent of disability of one seeking a reasonable accommodation because of their disability; and give priority for accessible units at IS to people with mobility impairments. IHSC may also ask questions limited to determining whether a prospective tenancy would pose a direct threat to the health or safety of other individuals or would result in substantial physical damage to the property of others. IHSC may not, however, otherwise inquire into the nature and severity of applicants' disabilities to determine if they need services IS is not required to provide; prohibit tenants from arranging for and receiving those services in their apartments; or deny tenancy to people because they need such services so long as they are either elderly or have a physical disability.

The court also issues a permanent injunction against defendants, their officers, agents, servants, employees, attorneys, and those in active concert or participation with them who receive actual notice of this order by personal service or otherwise, restraining them from that conduct prohibited in the preceding paragraph and from establishing, publishing, or applying policies or practices that:

(1) request or require the disclosure of confidential personal or medical information or the nature and extent of disability except as necessary to determine whether a person falls within one of the groups IS was set up to serve, to determine the extent of disability of one seeking a reasonable accommodation because of his or her disability, to decide whether to give priority for an accessible unit to a person with mobility impairments, or to determine whether a prospective tenancy would pose a direct threat to the health or safety of other individuals or would result in substantial physical damage to the property of others;

(2) exclude from tenancy persons, otherwise qualified for tenancy at IS, who require the assistance of others, including attendants, to meet their personal care needs.

Except as set forth above in this section IV, plaintiffs' motion is denied.

DATED: 8/25/98

RONALD M. WHYTE

United States District Judge